**No. 24-7288**
_____

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

─────

**UNITED STATES OF AMERICA,**

Plaintiff-Appellee,

v.

**JOSE WALTER CLAROS,**

Defendant-Appellant.

─────

Appeal from the
United States District Court
for the Southern District of California
Honorable Linda Lopez Presiding

─────

**APPELLANT'S OPENING BRIEF**

─────

Kara Hartzler
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, CA 92101
(619) 234-8467
Kara_hartzler@fd.org
Attorneys for Appellant

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ........................................................................ iv

INTRODUCTION ............................................................................................ 1

JURISDICTIONAL STATEMENT .................................................................. 3

I.    Basis for Jurisdiction in the District Court .................................. 3

II.   Basis for Appellate Jurisdiction ..................................................... 3

III.  Bail Status ......................................................................................... 3

ISSUES PRESENTED FOR REVIEW ............................................................. 3

I.    Whether Mr. Claros' expert witness was admissible under
      Federal Rules of Evidence 702 and 704(b). .................................. 3

II.   Whether the government's failure to disclose its unsuccessful
      search for a Mexican birth certificate and provide additional
      details violated *Brady v. Maryland*. ................................................. 3

RELEVANT STATUTORY PROVISIONS ........................................................ 4

STATEMENT OF THE CASE .......................................................................... 5

I.    Mr. Claros was raised in a series of foster homes and never
      knew where he was born. ................................................................. 5

II.   In 1982, an immigration official was skeptical that
      Mr. Claros was born in Mexico but sent him there anyway. .......... 6

III.  For the next forty-two years, Mr. Claros gives inconsistent
      responses about his place of birth and his parents' names. ............ 7

IV.   Mr. Claros reenters the United States and is prosecuted for
      illegal reentry. .................................................................................. 9

V.    Mr. Claros withdraws his guilty plea after defense counsel discovers the 1982 document calling his Mexican citizenship into question. ............................................................. 10

VI.   Mr. Claros proffers an expert witness to testify about foster children's understanding of their nationality and whether U.S. citizens are ever deported to Mexico. ...................... 10

VII.  The district court excludes Mr. Claros' expert witness, claiming her testimony would only provide "generalities." ........... 13

VIII. The night before trial, the government discloses that it was unable to find a birth certificate for Mr. Claros in Mexico. .......... 15

IX.   The district court finds that the government's failure to disclose its birth certificate search did not violate *Brady*. ............ 17

X.    At trial, the government's case hinges on Mr. Claros' prior statements, his deportations, and a government witness's testimony that Mexico does not accept U.S. citizens .................... 18

SUMMARY OF ARGUMENT ......................................................... 22

ARGUMENT .......................................................................... 23

I.    The district court improperly excluded Professor Cooper's expert testimony. ............................................................. 23

    A.   Standard of review .............................................. 23

    B.   This Court reviews the admissibility of expert testimony under Rules 702 and 704(b). .............................. 24

    C.   Professor Cooper's expert testimony was admissible under Rules 702 and 704(b). ................................... 28

        1.   Professor Cooper's testimony was admissible under Rule 702. ....................................... 28

        2.   Professor Cooper's testimony was admissible under Rule 704(b). ...................................... 32

D.　　The district court did not correctly apply the Federal Rules of Evidence, *Diaz*, or this Court's precedent. ............. 35

E.　　The government cannot show this error was harmless. ...... 40

II.　The government's failure to disclose its search for the birth certificate and provide further details violated *Brady*. ................ 44

A.　　Standard of review .................................................. 44

B.　　A *Brady* violation occurs when evidence is favorable, suppressed, and material. ....................................... 44

C.　　The government's failed search for Mr. Claros' birth certificate was favorable, suppressed, and material. ........... 45

1.　　The evidence was favorable. ....................... 46

2.　　The evidence was suppressed. .................... 48

3.　　The evidence was material. ....................... 50

CONCLUSION .................................................................. 55

# TABLE OF AUTHORITIES

**CASES**                                                               **PAGE(S)**

*Brady v. Maryland,*
    373 U.S. 83 (1963) ............................................................. *passim*

*Daubert v. Merrell Dow Pharms., Inc.,*
    509 U.S. 579 (1993) ................................................................. 37

*Diaz v. United States,*
    602 U.S. 526 (2024) ......................................................... passim

*Gantt v. Roe,*
    389 F.3d 908 (9th Cir. 2004) .............................................. 46

*Kyles v. Whitley,*
    514 U.S. 419 (1995) .......................................................... 49, 51

*Taylor v. Illinois,*
    484 U.S. 400 (1988) ............................................................... 24

*United States v. Bighead,*
    128 F.3d 1329 (9th Cir. 1997) ...................................... passim

*United States v. Bruce,*
    984 F.3d 884 (9th Cir. 2021) .............................................. 45

*United States v. Bundy,*
    968 F.3d 1019 (9th Cir. 2020) ........................................... 44

*United States v. Campos,*
    217 F.3d 707 (9th Cir. 2000) .............................................. 35

*United States v. Cano,*
    934 F.3d 1002 (9th Cir. 2019) ...................................... 49, 50

iv

*United States v. Cloud,*
    102 F.4th 968 (9th Cir. 2024) ...................................................... passim

*United States v. Cohen,*
    510 F.3d 1114 (9th Cir. 2007) ...............................................24, 40, 43

*United States v. Evans,*
    728 F.3d 953 (9th Cir. 2013) ...............................................................23

*United States v. Finley,*
    301 F.3d 1000 (9th Cir. 2002) ................................................... *passim*

*United States v. Hadley,*
    918 F.2d 848 (9th Cir. 1990) ...............................................30, 32, 33

*United States v. Halamek,*
    5 F.4th 1081 (9th Cir. 2021) ......................................................30, 32

*United States v. Hinkson,*
    585 F.3d 1247 (9th Cir. 2009) ...................................................24, 35

*United States v. Kohring,*
    637 F.3d 895 (9th Cir. 2011) ......................................................51, 54

*United States v. Lopez,*
    913 F.3d 807 (9th Cir. 2019) ......................................................42, 43

*United States v. Lukashov,*
    694 F.3d 1107 (9th Cir. 2012) ...................................................30, 32

*United States v. Morales,*
    108 F.3d 1031 (9th Cir. 1997) (en banc) .................................... *passim*

*United States v. Price,*
    566 F.3d 900 (9th Cir. 2009) .................................................45, 46, 50

*United States v. Rivera-Sillas,*
    417 F.3d 1014 (9th Cir. 2005) ...........................................................33

*United States v. Seschillie,*
310 F.3d 1208 (9th Cir. 2002)................................................................41

*United States v. Vallejo*
237 F.3d 1008 (9th Cir. 2001)...................................................*passim*

**Statutes**

8 U.S.C. § 1326 .....................................................2, 3, 4, 10, 33
18 U.S.C. § 3742(a) .........................................................................3
28 U.S.C. § 3231 ..............................................................................3
28 U.S.C. § 1291 ..............................................................................3
28 U.S.C. § 1294(1) ..........................................................................3

**Rules**

Fed. R. App. P. 4(b).........................................................................3
Fed. R. Evid. 702(a) ...............................................................*passim*
Fed. R. Evid. 704(b) ...............................................................*passim*

**Other Authorities**

*U.S. Government Unlawfully Detaining and Deporting U.S. Citizens As
Aliens*, 18 Va. J. Soc. Pol'y & L. 606 (2011).........................................31

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | U.S.C.A. No. 24-7288 |
| Plaintiff-Appellee, | U.S.D.C. No. 23-CR-2276-LL-1 |
| v. | |
| JOSE WALTER CLAROS, | **APPELLANT'S OPENING BRIEF** |
| Defendant-Appellant. | |

### INTRODUCTION

Jose Walter Claros does not know where he was born. All he remembers is living in an unknown location before someone drove him to live with his aunt in Los Angeles when he was five. When he was ten, he ran away and ended up living with a series of foster parents in east Los Angeles.

In 1982, when Mr. Claros was 13 years old, he and several neighborhood kids stole some hubcaps and ended up in juvenile detention. An officer from the Immigration and Naturalization Service (INS) interviewed him and asked where he was born. Mr. Claros gave several conflicting locations in Mexico where his foster parents were from. The INS officer was skeptical and wrote on a form that Mr. Claros "may not be a citizen of Mexico." Nevertheless, she had him sign a "voluntary return" form and sent him there.

1

That "admission" of Mexican birth would seal Mr. Claros' fate for the next four decades. Now listed in the immigration system as a "citizen" of Mexico, Mr. Claros was caught in an endless loop of border crossings and deportations. But when he went to find his birth certificate so he could make a life in Mexico, officials searched and told him that none existed.

In 2023, Mr. Claros was arrested and charged with illegal reentry under 8 U.S.C. § 1326. But this time, his lawyer found the 1982 INS form doubting that he was a citizen of Mexico and probed Mr. Claros about his personal history. The case then went to trial, where the only question was whether the government could prove beyond a reasonable doubt that Mr. Claros was born outside the United States.

But two critical errors infected this trial. First, Mr. Claros sought to have one of the preeminent national experts on U.S. citizenship and migrant foster children testify at his trial. But the district court excluded this expert without applying the Federal Rules of Evidence.

Second, the night before trial the prosecutor disclosed that the government had conducted an unsuccessful month-long search for a Mexican birth certificate for Mr. Claros. Yet the district court held that the prosecutor's failure to disclose this or respond to Mr. Claros' follow-up inquiries about the search were not due process violations under *Brady v. Maryland*, 373 U.S. 83 (1963). For either reason, this Court should remand for a new trial.

2

JURISDICTIONAL STATEMENT

## I.     Basis for Jurisdiction in the District Court

Mr. Claros appeals his conviction for illegal reentry under 8 U.S.C. § 1326 in the U.S. District Court for the Southern District of California. The district court had original subject matter jurisdiction under 28 U.S.C. § 3231.

## II.    Basis for Appellate Jurisdiction

This Court has jurisdiction over a timely appeal from a final order entered in the Southern District of California, within the Ninth Circuit's geographical jurisdiction. 28 U.S.C. §§ 1291 & 1294(1); 18 U.S.C. § 3742(a). The district court sentenced Mr. Claros on November 18, 2024, and entered a final judgment on November 19, 2024. 1-ER-20–21. Mr. Claros filed a timely notice of appeal on December 2, 2024. Fed. R. App. P. 4(b). 4-ER-506.

## III.   Bail Status

Mr. Claros is currently incarcerated at MDC Los Angeles with a release date of June 20, 2025.

ISSUES PRESENTED FOR REVIEW

**I.     Whether Mr. Claros' expert witness was admissible under Federal Rules of Evidence 702 and 704(b).**

**II.    Whether the government's failure to disclose its unsuccessful search for a Mexican birth certificate and provide additional details violated *Brady v. Maryland*.**

3

RELEVANT STATUTORY PROVISIONS

Section 1326(a) of Title 8 states:

Subject to subsection (b), any alien who-

(1)     has been denied admission, excluded, deported, or removed
        or has departed the United States while an order of
        exclusion, deportation, or removal is outstanding, and
        thereafter

(2)     enters, attempts to enter, or is at any time found in, the
        United States, unless (A) prior to his reembarkation at a
        place outside the United States or his application for
        admission from foreign contiguous territory, the Attorney
        General has expressly consented to such alien's reapplying
        for admission; or (B) with respect to an alien previously
        denied admission and removed, unless such alien shall
        establish that he was not required to obtain such advance
        consent under this chapter or any prior Act,

shall be fined under title 18, or imprisoned not more than 2 years, or

both.

Federal Rule of Evidence 702 states:

A witness who is qualified as an expert by knowledge, skill,
experience, training, or education may testify in the form of
an opinion or otherwise if the proponent demonstrates to the
court that it is more likely than not that:

(a)     the expert's scientific, technical, or other specialized
        knowledge will help the trier of fact to understand the
        evidence or to determine a fact in issue;

(b)     the testimony is based on sufficient facts or data;

(c)     the testimony is the product of reliable principles and
        methods; and

4

(d)     the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Federal Rule of Evidence 704(b) states:

In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone.

The Fifth Amendment of the United States Constitution provides that no person shall be "deprived of life, liberty, or property, without due process of law[.]" U.S. Const. amend. V.

STATEMENT OF THE CASE

## I.    Mr. Claros was raised in a series of foster homes and never knew where he was born.

Mr. Claros does not know where he was born. 3-ER-297, 340. His earliest memories are of living with two foster parents, though he does not know where. 3-ER-257–58. When he was five years old, Mr. Claros first met his biological mother. 3-ER-258–59. He never met his biological father, who passed away before Mr. Claros was born. 3-ER-260.

When he was five, Mr. Claros' foster mother died from cancer, and his foster father had a stroke. 3-ER-261. At that point, Mr. Claros went to live with his biological mother but does not know where. 3-ER-261. He does not have "any memory of being in Mexico." 3-ER-280.

Mr. Claros' time with his biological mother was short-lived. After two months, he remembers that someone put him in a car and drove

5

him several hours to live with his aunt in Los Angeles. 3-ER-261–62. He does not remember crossing any borders during this trip. 3-ER-262.

Mr. Claros did not like living with his aunt. When he was ten years old, he ran away and ended up at a Catholic church in Los Angeles. 3-ER-264–66. He began living with a family named Garcia and then a series of other foster families through the church's foster care program. 3-ER-267–71. These families were all from Mexico. 3-ER-271–72. One of the families told him that if he were ever stopped by police, Mr. Claros should "just say you're from Mexico." 3-ER-279.

## II.   In 1982, an immigration official was skeptical that Mr. Claros was born in Mexico but sent him there anyway.

In 1982, when Mr. Claros was 13 years old, he was arrested with a group of neighborhood kids for stealing hubcaps. 3-ER-274–75. Eventually, he landed in immigration custody, where an officer from the former Immigration and Naturalization Service (INS) asked Mr. Claros where he was born. 3-ER-279. Following the instructions from his foster family, Mr. Claros said he was born in Mexico. 3-ER-279. At first, he told the officer that he was born in Zacatecas, Mexico, where one of his foster mothers had been born. 3-ER-281. Then he changed his story and said he was born in Tijuana. 3-ER-281. Mr. Claros also told the officer that he was 17 years old, even though he was only 13, because he "didn't want to end up in one of those group homes." 3-ER-275.

6

The INS officer who interviewed Mr. Claros was skeptical. In her I-213 report, the officer wrote that while Mr. Claros "claims to be a native and citizen of Mexico," he "appear[ed] to know very little about Mexico." 4-ER-505. She also observed that he "doesn't remember where his family lives in Mexico" and had "changed his place of birth (state) two different times." 4-ER-505. Because of these inconsistencies, the agent concluded that Mr. Claros "may not be a citizen of Mexico." 4-ER-505.

But the officer never actually investigated whether Mr. Claros was born in Mexico. Instead, because someone at the Mexican consulate (who never talked to Mr. Claros) thought he was a Mexican national, the officer decided to send Mr. Claros there. 3-ER-237, 4-ER-420. She presented Mr. Claros with a piece of paper and promised that if he signed it, he'd be "out of here." 3-ER-283. But perhaps still skeptical of his claimed nationality, the officer did not deport Mr. Claros—instead, she processed him as a voluntary return. 4-ER-420, 447.

## III. For the next forty-two years, Mr. Claros gives inconsistent responses about his place of birth and his parents' names.

When Mr. Claros arrived in Mexico, no one from the Mexican government met him or provided him any sort of Mexican identification paperwork. 3-ER-286. Instead, he simply walked out onto the streets of Tijuana. 3-ER-286. But the 13-year-old Mr. Claros "didn't have [a] place

to go," so he soon crossed the border and returned to the United States. 3-ER-287.

For the next four decades, Mr. Claros often lived in the U.S. for stretches of time before being deported. Whenever he was picked up by immigration agents, he would say he was from Mexico because "they already had me down as a Mexican." 3-ER-288. He thought that if he tried to say he didn't know where he was born, "they wouldn't believe me because I already lied one time." 3-ER-288. He had also heard from other people in immigration detention that if he tried to fight his case in front of an immigration judge, "[t]hey're going to keep you in there for at least two, three years" and then "send you back anyway." 3-ER-288.

During interviews with immigration agents, Mr. Claros continued to give inconsistent names, dates of birth, places of birth, and parents' names. 3-ER-300–22. For instance, he gave no fewer than four different names for his biological mother (most of which were the names of his foster mothers) because he "didn't know my real mom's name." 3-ER-289–90. At no time did Mr. Claros ever have a lawyer in these deportation proceedings. 3-ER-298.

After one deportation, Mr. Claros decided that he had "had enough" and was "going to stay [in Mexico] and find me a job." 3-ER-291. But to get a job, Mr. Claros needed documents showing he was a Mexican citizen. 3-ER-292. He traveled to a registrar's office to try to get a copy of his birth certificate. 3-ER-292. But "the workers look[ed] in

8

the computer" and "couldn't find me." 3-ER-292–93. So Mr. Claros was never able to get a birth certificate or any other form of identification showing he was a Mexican citizen. 3-ER-292–93.

## IV. Mr. Claros reenters the United States and is prosecuted for illegal reentry.

When Mr. Claros was living in Mexico in 2023, members of a drug cartel discovered through word of mouth that he was a "gringo" and tried to recruit him to cross the border with a backpack of drugs. 4-ER-420. When he refused, the cartel members brutally beat him and told him they would come back for him 4-ER-420.

Fearing for his life, Mr. Claros immediately made his way to the San Ysidro port of entry and asked to apply for asylum. 4-ER-421. But Mexican officials turned him away, telling him the border was "closed." 3-ER-295–96. Mr. Claros "didn't want to pick an argument because I didn't have an ID." 3-ER-295. Still injured, he took a taxi to a place along the border and crossed through the desert only hours after his attack. 3-ER-296, 4-ER-421.

Mr. Claros walked through the desert for 12 hours with no food or water. 3-ER-296. Finally, he reached a major highway, where a Border Patrol agent pulled over and questioned him. 3-ER-201–03, 297. Exhausted, injured, and scared, Mr. Claros gave a false name and told the agent he was walking to San Diego to see a friend. 3-ER-297, 330, 333.

9

The agent detained Mr. Claros and soon discovered his history of deportations. 3-ER-203–04. When Mr. Claros arrived at the federal jail, the medical staff documented numerous injuries. 3-ER-347. The government then charged him with being found in the United States after a prior removal under 8 U.S.C. § 1326(a). 4-ER-502.

## V. Mr. Claros withdraws his guilty plea after defense counsel discovers the 1982 document calling his Mexican citizenship into question.

During the initial stages of his prosecution, Mr. Claros signed a plea agreement and once again said he was born in Mexico. 3-ER-181–82. But before he entered that plea, his defense attorney reviewed the immigration file and found the 1982 document stating that Mr. Claros "may not be a citizen of Mexico." 3-ER-182, 4-ER-505. The attorney then probed Mr. Claros and found that Mr. Claros didn't actually know where he was born. The only proof that he was a Mexican citizen was his statement as a 13-year-old street kid, which had served as the basis for all his subsequent statements of alienage and deportations. Because Mr. Claros could not truthfully admit the element of alienage, he withdrew his plea, and the case was set for trial. 3-ER-182.

## VI. Mr. Claros proffers an expert witness to testify about foster children's understanding of their nationality and whether U.S. citizens are ever deported to Mexico.

To explain why a 13-year-old street kid might have wrongly claimed to be a Mexican national, defense counsel sought to introduce

10

Professor Holly S. Cooper as an expert witness. 4-ER-423–25. Defense counsel submitted a 34-page declaration and curriculum vitae from Professor Cooper detailing her long and distinguished career as an immigration lawyer with expertise in citizenship law and the representation of migrant children. 4-ER-442–76.

As explained in her statement and curriculum vitae, Professor Cooper was a clinical immigration professor at the University of California of Davis who had worked with migrant children in the U.S. immigration detention and removal system for over twenty years. 4-ER-443. She founded the first program in the U.S. to offer representation for migrant children, was appointed as class counsel in three leading children's federal class actions, and had interviewed hundreds of immigrant children from all over the world. 4-ER-443. One of her "unique specialties" was "representing immigrant children in the U.S. foster care system" who had been "abused, abandoned, and neglected." 4-ER-443.

Professor Cooper also had deep experience with the nation's "complicated and unintuitive" citizenship laws. 4-ER-448. She "often meet[s] individuals who I assess to be U.S. citizens who erroneously believed they were undocumented"—a phenomenon that is "especially true for children." 4-ER-448. This is because "[c]hildren often do not understand the concept of citizenship or nationality," so it is "not uncommon to meet an immigrant child who does not know their date of

11

birth, place of birth, or their parents' names." 4-ER-448. This is
"especially true for foster children and orphans, who may not have
family to tell them about their heritage or nationality" and thus have
"no understanding of their personal histories." 4-ER-448.

Professor Cooper reviewed Mr. Claros' immigration file and found
that the details of his case were "consistent" with her experience
because "many children in the immigration system—especially those in
the foster system—do not have reliable information about their own
origins." 4-ER-449. They "do not know their biological parents, do not
know their precise date of birth, and do not know where they were
born." 4-ER-449. She also provided context for Mr. Claros' false claim
that he was 17 years old, explaining that many children "state that they
are older than they actually are" because they believe they can "avoid
being placed back into foster care or assert more agency over their
futures." 4-ER-449.

Given the pressures of removal and the complexity of immigration
law, Professor Cooper also noted the "verifiable phenomenon" that
"some U.S. citizens end up getting erroneously deported." 4-ER-449.
Professor Cooper herself had "represented U.S. citizens who have been
wrongfully deported" in cases that led to published opinions in federal
court. 4-ER-449–50. Though "we do not know the true number of U.S.-
citizen deportees," she estimated that when interviewing people in

immigration custody, "around ten percent of the individuals I interview have claims to U.S. citizenship that I need to investigate." 4-ER-449–50.

Given Professor Cooper's expertise in migrant children and citizenship law, Mr. Claros explained that her testimony would help the jury in two ways. 4-ER-423–25. First, it would aid the jury in understanding why "someone in Mr. Claros's position would erroneously admit alienage or provide wildly inconsistent dates of birth, places of birth, and even the names of his parents." 4-ER-424. Second, it would show the jury that some children and adults who have been deported have "turned out to be U.S. citizens who have previously claimed to be foreign nationals." 4-ER-424.

## VII. The district court excludes Mr. Claros' expert witness, claiming her testimony would only provide "generalities."

During the motions in limine hearing, the district court precluded Professor Cooper from testifying. 1-ER-3-4. The court stated that Professor Cooper's testimony was "not relevant" because she would only provide "generalities that can happen to minors who are deported," which would not "make[ ] an element of the crime charged any more or less true." 1-ER-3-4. The court also opined that Professor Cooper was not "familiar with the process that Mr. Claros specifically experienced" and that he was not one of the individuals she had "worked with in the past." 1-ER-4. The court also inexplicably stated that Mr. Claros was not "involved in the foster care system"—even though his motion had

13

stated that he was "raised in the Los Angeles County foster and juvenile justice system." 1-ER-4, 4-ER-419.

Defense counsel objected, drawing an analogy to the Supreme Court's recent decision in *Diaz v. United States*, 602 U.S. 526 (2024). Counsel pointed out that *Diaz* permitted expert witnesses to testify as to the "[g]eneralized habits of drug users and dealers," such as "whether drug couriers tend to know that there are drugs secreted in their cars when they cross the border." 1-ER-6. So even though Professor Cooper, like the expert in *Diaz*, did not "know Mr. Claros," her "vast experience over decades of practicing in the immigration system—specifically, representing children in Mr. Claros's position"—gave her a basis to explain why such statements of alienage may not be reliable. 1-ER-7. Without such context to "frame" the issue, the jury was "simply not going to understand why a kid could be deported, and then 40 – 42 years later come back and contest his guilt at trial." 1-ER-7. Moreover, defense counsel noted that any concerns that Professor Cooper did not "know Mr. Claros" or "the circumstances of his particular case" could be "fair game for cross." 1-ER-7.

But the court rejected the analogy to *Diaz*, claiming that Professor Cooper's testimony "wouldn't really be the same" as a drug expert. 1-ER-9. Drug experts, the court believed, could testify that "couriers are sometimes knowing and sometimes unknowing," and that a defendant's "mannerisms" could be "consistent with a person who . . . is a courier."

14

1-ER-9. The court saw a "distinction" between Mr. Claros' case and *Diaz* but never explained what that distinction was. 1-ER-9. On this basis, the court excluded Professor Cooper's expert testimony. 1-ER-9. The court never addressed Professor Cooper's ability to testify as to whether U.S. citizens are actually deported to Mexico. 1-ER-6–9.

## VIII. The night before trial, the government discloses that it was unable to find a birth certificate for Mr. Claros in Mexico.

At 8:30 p.m. on the night before trial, the prosecutor e-mailed defense counsel and disclosed that the government had conducted an unsuccessful search for Mr. Claros' birth certificate in Mexico. 1-ER-11, 30, 3-ER-182. Specifically, the immigration official in charge of Mr. Claros' immigration file (known as the "A-file custodian") had reached out to a federal agent "acting as a liaison in Mexico" to determine whether Mexico could "locate a birth certificate associated with Mr. Claros's information." 1-ER-11. Within an hour of this disclosure, defense counsel responded with a series of questions regarding the name of this U.S. liaison, the Mexican government officials he contacted, and "most critically, when did the United States receive this information?" 1-ER-12. But the prosecutor did not answer any of these questions. 1-ER-12.

Defense counsel explained that the failure to disclose this "probative *Brady* evidence" had denied Mr. Claros "the opportunity to actually use it in Mr. Claros's defense." 1-ER-12. For instance,

15

Mr. Claros had no ability to interview these "second- and third-hand hearsay witnesses" to gather evidence about the birth certificate search or present these witnesses' testimony at trial. 1-ER-12. Mr. Claros thus moved to dismiss the case on due process grounds under *Brady*. 1-ER-12–13.

The district court was "somewhat troubled" by this revelation and asked the prosecutor to respond. 1-ER-14. The prosecutor admitted that "several weeks ago" an agent had searched for a birth certificate using Mr. Claros' name. 1-ER-14–15. But when no birth certificate was found, the government did not immediately disclose this to Mr. Claros. Instead, its U.S. liaison went back to do another search using the "multiple dates of births and multiple names" that Mr. Claros had provided in the past. 1-ER-15. The liaison then "confirmed" the night before trial that no birth certificate existed that matched any of these names or dates of birth. 1-ER-15.

In later discussions, the government tried to justify its failure to disclose by saying that it had "received a signed plea agreement that Defendant was a Mexican citizen" and thus had "every indication that he was a Mexican citizen." 3-ER-181. But defense counsel pointed out that after submitting the plea agreement, he had reached out to the prosecutor with questions about the 1982 document that "cast some doubt on Mr. Claros's nationality." 3-ER-182. Soon after, Mr. Claros withdrew his signed plea, and the case was set for trial. 3-ER-182.

Thus, the government had been on notice of Mr. Claros' citizenship defense for at least five months. 3-ER-182. At a minimum, Mr. Claros' motion to admit an expert witness had put the government on notice of his citizenship defense four weeks before trial. 4-ER-419–76.

## IX.  The district court finds that the government's failure to disclose its birth certificate search did not violate *Brady*.

Despite the government's failure to disclose its search and the details surrounding it, the district court denied Mr. Claros's *Brady* motion. 1-ER-16. Instead, the court said it would permit Mr. Claros to cross-examine the A-file custodian who had reached out to the U.S. liaison. 1-ER-16–17.

Defense counsel maintained his objection, stating that this was an "inadequate remedy," since the A-file custodian could not "speak with any sort of firsthand knowledge about what steps were actually taken" to search for the birth certificate. 1-ER-17–18. Because the custodian did not know "who in the Mexican government was contacted," Mr. Claros "need[ed] these actual witnesses on the stand in front of the jury" to give the evidence "its full exculpatory force." 1-ER-18. The court denied the objection, stating, "If I got it wrong, the Ninth Circuit can tell me I got it wrong" and "we'll do it again." 1-ER-18.

**X.    At trial, the government's case hinges on Mr. Claros' prior statements, his deportations, and a government witness's testimony that Mexico does not accept U.S. citizens.**

At trial, the government never submitted any independent documentation showing that Mr. Claros had been born in Mexico. Instead, all of its evidence focused on Mr. Claros' past statements and the resulting deportation orders. 1-ER-38–3-ER-387.

The government's key witness was the A-file custodian. 2-ER-54–153. This custodian testified about the deportation documents in Mr. Claros' A-file and the information they contained. Over objection, the court also permitted the government to question the custodian about his "general experience" in carrying out deportations—specifically, whether Mexico ever refuses to accept someone who may be a U.S. citizen:

| | |
|---|---|
| Prosecutor: | [W]hen you hand [deportees] over to the Mexican consulate or whoever is there from Mexico, do they ever send them back to you? |
| Custodian: | They have, yes. |
| Prosecutor: | Why? |
| Custodian: | They verified that they [weren't] a citizen of Mexico. |
| Prosecutor: | To confirm, has that personally happened to you? |
| Custodian: | Yes, it has. |
| Prosecutor: | And have they then been sent back to you? |
| Custodian: | Yes, they have. . . . |

18

| Prosecutor: | Have you personally handed someone over and had Mexico return them to you? |
| Custodian: | Yes. |
| Prosecutor: | And was that because Mexico – your understanding, why was that? |
| Custodian: | They, once again, did their due diligence to find out if they were a Mexican citizen, and they came back with "no," that they weren't. So, they sent them back to us to, I guess, go further in depth and verify where they are a citizen of. |

2-ER-71–72.

The prosecutor also asked the custodian about his unsuccessful search for Mr. Claros' birth certificate. 2-ER-95–96. But the prosecutor's questions cast doubt on the reliability of this search, asking the custodian whether he knew if "the people you provided information to actually provided that information to the Mexican people and what was actually searched?" 2-ER-96. Defense counsel objected, pointing out that the government's failure to disclose its search meant he'd had "no opportunity" to find out "exactly what was done" or "who the officials in Mexico were" to be able to rebut this inference. 2-ER-96. But the district court overruled the objection. 2-ER-97.

During cross examination, the A-file custodian testified that he had initiated the search for Mr. Claros' birth certificate "approximately four weeks" before trial. 2-ER-143. The custodian also admitted that he could not provide any details about the search for Mr. Claro's birth certificate. He did not know the last name of the U.S. liaison who

reached out to the Mexican government. 2-ER-143. He could not confirm that this liaison *had* actually reached out to the Mexican government. 2-ER-143. He did not know the name of the Mexican consular official. 2-ER-144. He was "not exactly sure what names [he] submitted" for Mr. Claros. 2-ER-144. He was not sure which dates of birth he submitted. 2-ER-145. The custodian then refused to say that there was "no record of *Mr. Claros* in Mexico"—only that there was no record of someone with the *names and birthplaces* the custodian had provided. 2-ER-146, 147 (emphasis added).

After the government rested, Mr. Claros testified in his own defense. 3-ER-256–343. He explained that he did not know where he was born and had no memory of being in Mexico before he was sent there when he was 13. 3-ER-260, 297, 340. He described growing up in a series of foster families without knowing anything about his family history. 3-ER-257–74. He admitted having said that he was born in Mexico when he was 13 and then repeating this statement for years afterwards because "they already had me down as a Mexican" and "wouldn't believe me" if he'd claimed otherwise. 3-ER-288.

On cross-examination, the prosecutor pointed out all the times Mr. Claros had given false information to immigration officials, concluding that he had "lied more than 45 times to the immigration services." 3-ER-300–22. The prosecutor then commented that it was "no surprise they couldn't find [his] birth certificate, right? . . . Because they

20

didn't have accurate information, correct?" 3-ER-322. Defense counsel
again objected based on the government's failure to disclose the details
of the search for his birth certificate. 3-ER-322. The district court
overruled this objection. 3-ER-322.

During closing arguments, the government returned to its theme
that Mr. Claros "admitted that he was not a United States citizen" and
"told immigration officers, not once, not twice, but multiple times over a
40-year period that he was a Mexican citizen." 3-ER-356. Any argument
to the contrary, the government repeatedly claimed, was mere
"speculation." 3-ER-363, 364, 384, 385.

The prosecutor also seized on the custodian's testimony that the
custodian had once seen Mexico refuse to accept a deportee. 2-ER-71–
72, 3-ER-362. Rather than cite this as a single experience of a single
agent, the prosecutor broadly presented this as fact, telling the jury
that "if the United States showed up and tried to send over a United
States citizen, that person would be sent back." 3-ER-362. Mr. Claros
objected, but the district court overruled his objection. 3-ER-362.

The prosecutor then continued: "Let me say that again: When
someone is presented at the border, when they are sent over to Mexico,
if they're a United States citizen, Mexico sends them back." 3-ER-362.
The prosecutor used this to argue that because Mr. Claros was
"accepted by Mexico," he must not be a U.S. citizen. 3-ER-362–63. On
rebuttal, the prosecutor repeated this argument, asserting that each

21

time Mr. Claros was deported, "Mexico accepted [him]. Mexico didn't turn him back. They accepted him." 3-ER-385.

The jury convicted Mr. Claros of the single count of illegal reentry. 2-ER-25. This appeal follows.

## SUMMARY OF ARGUMENT

The district court committed two errors that went to the only contested issue at trial—whether the government had proven beyond a reasonable doubt that Mr. Claros was not a U.S. citizen.

First, the court should not have barred Mr. Claros' expert witness from testifying. Professor Cooper's testimony satisfied Federal Rule of Evidence 702 because she had sufficient expertise and would have helped the jury understand that children—particularly those in foster care—often lack knowledge of their place of birth and make unreliable statements in immigration proceedings. She also would have helped the jury understand that Mexico accepts some deportees who are actually U.S. citizens. Professor Cooper's testimony would not have run afoul of Federal Rule of Evidence 704(b) because it did not go to Mr. Claros' mens rea and was precisely the type of expert testimony the Supreme Court permitted in *Diaz*. And the exclusion of Professor Cooper prejudiced Mr. Claros because she would have corroborated his testimony and rebutted the government's non-expert claim that Mexico does not accept U.S. citizens.

22

Second, the government's failure to disclose its unsuccessful search for Mr. Claros' birth certificate and provide further details violated *Brady*. To establish a *Brady* violation, a defendant must show that evidence was favorable, suppressed, and material. Here, evidence of the government's unsuccessful search was favorable because it supported Mr. Claros' only defense at trial—that the government could not show he was born outside the U.S. It was also suppressed because some details of the search were never disclosed and the details that *were* disclosed came too late to be of value to Mr. Claros. Finally, the evidence was material because its suppression allowed the government to undermine the reliability of its own search and infer that a birth certificate for Mr. Claros still existed. For these reasons, this Court should remand for a new trial.

ARGUMENT

## I.   The district court improperly excluded Professor Cooper's expert testimony.

### A.   Standard of review

This Court reviews the district court's interpretation of the Federal Rules of Evidence de novo. *United States v. Evans*, 728 F.3d 953, 959 (9th Cir. 2013). It reviews for abuse of discretion a trial court's decision to admit or exclude expert testimony. *United States v. Finley*, 301 F.3d 1000, 1007 (9th Cir. 2002).

23

Abuse of discretion involves an "objective two-part test." *United States v. Hinkson*, 585 F.3d 1247, 1251 (9th Cir. 2009) (en banc). First, the Court must "determine de novo whether the trial court identified the correct legal rule to apply to the relief requested." *Id.* at 1262. Second, the Court must decide "whether the trial court's resolution of the motion resulted from a factual finding that was illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *Id.* at 1263.

## B.   This Court reviews the admissibility of expert testimony under Rules 702 and 704(b).

"Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Finley*, 301 F.3d at 1018 (quoting *Taylor v. Illinois*, 484 U.S. 400, 408 (1988)). Thus, "courts should use particular caution in applying the drastic remedy of excluding a witness altogether." *Id.* Here, the district court applied this "drastic remedy of excluding [Professor Cooper's testimony] altogether." *Id.* This Court must now decide whether that exclusion was proper.

In determining whether a trial court properly admitted or excluded an expert witness, "Federal Rules of Evidence 702 and 704(b) govern the admissibility of [expert] testimony." *United States v. Cohen*, 510 F.3d 1114, 1123 (9th Cir. 2007); *see also United States v. Morales*, 108 F.3d 1031, 1037–38 (9th Cir. 1997) (en banc) (analyzing the exclusion of an expert witness under Rules 702 and 704(b)); *Finley*, 301

24

F.3d at 1007 ("[W]e must evaluate the admissibility of the proffered evidence under both [Rule 702 and 704(b)].").

Rules 702 and 704(b) provide a complementary framework for determining whether to admit expert testimony. First, Rule 702 lays out the baseline requirements for proffering an expert witness, stating that a proponent must show it is "more likely than not" that the testimony:

    (a)    will "help the trier of fact to understand the evidence or to determine a fact in issue";

    (b)    is "based on sufficient facts or data";

    (c)    is the "product of reliable principles and methods"; and

    (d)    reflects a "reliable application" of those principles and methods to the case.

Fed. R. Evid. 702. This Court has paraphrased these requirements into a three-part test that considers whether "the subject matter at issue is beyond the common knowledge of the average layman, the witness has sufficient expertise, and the state of the pertinent art or scientific knowledge permits the assertion of a reasonable opinion." *United States v. Morales*, 108 F.3d 1031, 1038 (9th Cir. 1997) (en banc) (quotations and alterations omitted).

But even if expert testimony satisfies these factors, Rule 704(b), provides a critical limitation. Specifically, 704(b) states:

In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a

25

> mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone.

Fed. R. Evid. 704(b). This rule "allows testimony supporting an inference or conclusion" as to a defendant's mental state so long as the expert "does not draw the ultimate inference or conclusion for the jury." *Morales*, 108 F.3d at 1038.

The Supreme Court's decision in *Diaz*, 602 U.S. 526, recently provided new guidance on Rule 704(b). 1-ER-6–9. In *Diaz*, the trial court admitted a government drug trafficking expert to rebut the defense of an accused who claimed to be an unknowing courier. *Id*. at 529–30. The government expert testified that because drug traffickers "generally do not entrust large quantities of drugs" to people unaware they are carrying them, "most couriers know they are transporting drugs." *Id*. at 530. Ms. Diaz did not dispute that this expert testimony was admissible under Rule 702 but argued that it violated Rule 704(b) because it "functionally stated an opinion about whether [she] knowingly transported drugs." *Id*. at 535 (quotations and alterations omitted).

The *Diaz* majority disagreed. It held that because the expert testified about "the knowledge of *most* drug couriers," that testimony "d[id] not necessarily describe Diaz's mental state," since she "may or may not be like most drug couriers." *Id*. at 534 (emphasis *Diaz*). This did not encroach on the jury's fact-finding role because the testimony

was merely "evidence for the jury to consider or reject when deciding whether Diaz in fact knew about the drugs in her car." *Id*. at 535. Thus, where an expert testifies that the defendant was "part of a group of persons that *may or may not* have a particular mental state," the "ultimate issue of [the defendant's] mental state was left to the jury's judgment." *Id*. at 536 (emphasis *Diaz*).

Justice Jackson concurred, emphasizing that "Rule 704(b) is party agnostic." *Id*. at 538. She also noted that expert testimony may provide "critical assistance to lay factfinders" in cases beyond drug trafficking— for instance, situations involving domestic abuse or a defendant's mental health. *Id*. at 540–41. Moreover, Justice Jackson explained that trial courts could avoid "potential misuses" of the Rule by permitting "vigorous cross-examination" and providing "specific admonitions and instructions." *Id*. at 541–42. Justice Gorsuch's dissent agreed that the majority's opinion allows defendants to use their own experts in these contexts because "what is good for the goose is good for the gander." *Id*. at 545, 551.

In sum, determining the admissibility of expert testimony first requires trial courts to consider under Rule 702 whether the subject matter is "beyond the common knowledge of the average layman," the witness has "sufficient expertise," and the subject "permits the assertion of a reasonable opinion." *Morales*, 108 F.3d at 1038. If it does, the testimony is admissible under Rule 704(b) so long as the "ultimate

issue of [the defendant's] mental state [i]s left to the jury's judgment."
*Diaz*, 602 U.S. at 536. Moreover, these Rules allow *both* parties to use
expert witnesses to provide "critical assistance to lay factfinders." *Id.* at
540 (Jackson, J., concurring).

### C. Professor Cooper's expert testimony was admissible under Rules 702 and 704(b).

Mr. Claros sought to admit Professor Cooper's expert testimony
for two reasons: 1) to explain why abandoned children in foster care
might provide unreliable and inconsistent information about their
personal histories to immigration officials, and 2) to show that some
U.S. citizens are erroneously deported to other countries. 4-ER-423–25.
Under Rule 702 and 704(b), her testimony was admissible.

### 1. Professor Cooper's testimony was admissible under Rule 702.

Professor Cooper's testimony satisfied all the requirements of Rule
702 and this Court's precedent interpreting it.

First, Professor Cooper's testimony would have "help[ed] the trier
of fact to understand the evidence" because the issues were "beyond the
common knowledge of the average layman." Fed. R. Evid. 702(a);
*Morales*, 108 F.3d at 1038. Professor Cooper would have testified that
children in the foster care system "may not have family to tell them
about their heritage or nationality" and thus have "no understanding of
their personal histories." 4-ER-448. As a result, they "do not know their

28

biological parents, do not know their precise date of birth, and do not know where they were born." 4-ER-449. Because many jurors have no experience with children in the foster care and immigration systems, Professor Cooper's testimony would have aided them in understanding why a 13-year-old Mr. Claros might have provided unreliable and inconsistent answers to an immigration official about his place of birth and personal history.

This Court has frequently admitted expert evidence to aid the jury in understanding the reliability of a child's statements. For instance, in *United States v. Vallejo,* this Court reversed a trial court's decision to exclude a school psychologist's testimony about "the special problems that former special education students have when attempting to communicate in English in high pressure situations." 237 F.3d 1008, 1019 (9th Cir. 2001). This Court held that such testimony would have helped jurors understand "why the defendant would make false statements even though they were inconsistent with his apparent self-interest." *Id.* at 1020 (quotations omitted).

Similarly, this Court has admitted expert testimony to explain the "general characteristics of child sexual abuse victims," such as "the timing of their reporting and their recollection of details." *United States v. Bighead*, 128 F.3d 1329, 1330 (9th Cir. 1997). In *Bighead*, as here, the expert "never examined" the child in question, yet her "observations of typical characteristics drawn from many years [of] experience

29

interviewing many, many persons" aided the jury in understanding the child victim's behavior. *Id.*

In *United States v. Lukashov*, this Court also found admissible an expert's testimony regarding common characteristics of "a child victim's story of sexual abuse" and whether they were consistent with the victim's story. 694 F.3d 1107, 1116 (9th Cir. 2012). This testimony was "helpful to the jury because some jurors would not have a general understanding of an eight-year-old's sexual knowledge and vocabulary and the level of sensory detail to look for." *Id.* And in *United States v. Hadley*, an expert's testimony about "general behavior characteristics that may be exhibited in children who have been sexually abused" was helpful in "assist[ing] the trier of fact in understanding the evidence." 918 F.2d 848, 852 (9th Cir. 1990). *See also United States v. Halamek*, 5 F.4th 1081, 1088 (9th Cir. 2021) (expert's "[e]xtensive experience interviewing [child] victims" qualified them to testify).

Here, as in *Vallejo, Bighead, Hadley, Lukashov,* and *Halamek*, Professor Cooper would have testified about the "general characteristics" of a particular subset of minors—orphans and foster children in immigration proceedings. This testimony would have helped the jury understand why a foster child in Mr. Claros' position might do things "inconsistent with his apparent self-interest," such as making "false statements" of alienage, *Vallejo*, 237 F.3d at 1020, or having an incomplete "recollection of details," *Bighead*, 128 F.3d at 1330.

30

Professor Cooper also would have "help[ed] the trier of fact to understand" the "verifiable phenomenon" that "some U.S. citizens end up getting erroneously deported." Fed. R. Evid. 702(a); 4-ER-449. According to one source, the government has been "misclassifying its own citizens as aliens and deporting them for over 100 years." Jacqueline Stevens, *U.S. Government Unlawfully Detaining and Deporting U.S. Citizens As Aliens*, 18 Va. J. Soc. Pol'y & L. 606, 607 (2011). By one estimate, more than 20,000 citizens have been wrongfully deported since 2003. *See id.* Professor Cooper herself had "represented U.S. citizens who have been wrongfully deported" and estimated that about ten percent of the individuals she interviews require further investigation into their citizenship. 4-ER-449–50. This "verifiable phenomenon" of U.S. citizens being deported is certainly "beyond the common knowledge of the average layman." *Morales*, 108 F.3d at 1038. Thus, Professor Cooper's testimony about deportations of U.S. citizens and foster children in immigration proceedings would have "aided the jury in assessing" these factual issues and satisfied the first prong of Rule 702. *Morales*, 108 F.3d at 1040.

The remaining requirements of Rule 702 address whether the expert and their methods are reliable—i.e., whether the expert's testimony was based on "sufficient facts or data," was the "product of reliable principles and methods," reflected "sufficient expertise," and showed a "reliable application" of the principles and methods. Fed. R.

Evid. 702; *Morales*, 108 F.3d at 1038. Here, Professor Cooper's expertise was on par with those of the experts in *Vallejo, Bighead, Hadley, Lukashov,* and *Halamek*. Her 34-page statement and curriculum vitae reflected decades of experience in immigration law and a long list of cases, publications, presentations, and awards. 4-ER-442–76. Professor Cooper has represented "hundreds of migrant children in removal proceedings" and was appointed class counsel to represent thousands more due to her "expertise in the rights of immigrant children." 4-ER-443. She has also represented and won published cases in federal courts for "individuals wrongfully deported who were U.S. citizens." 4-ER-450. As in *Bighead*, her "observations of typical characteristics drawn from many years [of] experience interviewing many, many persons" would have aided the jury in understanding Mr. Claros' behavior and the fact that U.S. citizens are sometimes deported. 128 F.3d at 1330. Thus, her testimony was admissible under Rule 702.

### 2. Professor Cooper's testimony was admissible under Rule 704(b).

Professor Cooper's testimony was also admissible under Rule 704(b). This Rule states that an expert witness "must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged." Fed. R. Evid. 704(b). Professor Cooper's testimony would not have run afoul of this Rule for at least two reasons.

32

First, Professor Cooper's testimony would not have addressed "a mental state or condition that constitutes an element of" § 1326, since the only mens rea requirement for § 1326 is knowledge of one's unlawful presence in the United States. *See United States v. Rivera-Sillas*, 417 F.3d 1014, 1020 (9th Cir. 2005). Here, Professor Cooper would not have testified about Mr. Claros' mens rea when he reentered the United States in 2023. Rather, she would have testified about the underlying reliability of Mr. Claros' statements as a 13-year-old in 1982 that led to the decades-long assumption of his alienage. 4-ER-447–51. She also would have testified that Mexico actually accepts deportees who are U.S. citizens. 4-ER-449–50. Thus, Professor Cooper's testimony would have gone to the element of alienage, not mens rea.

Second, Professor Cooper would have testified only about the reliability of statements from "a class of [defendants] generally"—not Mr. Claros specifically. *Hadley,* 918 F.2d at 852; *Bighead*, 128 F.3d at 1330. Under Rule 704(b), such testimony is permissible so long as "the jury would still have had to draw its own inference from that predicate testimony to answer the ultimate factual question." *Morales*, 108 F.3d 1037. Importantly, Professor Cooper would *not* have testified that Mr. Claros did not know where he was born. Rather, she would have testified that "Mr. Claros's A-File is *consistent* with [her] experience representing children" in the foster system, *many* of whom "do not know where they were born," "do not know their biological parents," and "do

not have reliable information about their own origins." 4-ER-449 (emphasis added). Thus, the jury was still "free to reject" the inference that Mr. Claros was like the children Professor Cooper described and could not provide reliable information about his place of birth. *Finley*, 301 F.3d at 1016.

This is precisely the distinction the Supreme Court drew in *Diaz*, 602 U.S. 526. There, the Supreme Court explained that Rule 704(b) only bars expert opinions "about a particular person ('the defendant') and a particular ultimate issue." *Id*. at 534. Expert testimony that "*most* drug couriers" know there are drugs in their cars does not encroach on the jury's fact-finding role, since it is merely "evidence for the jury to consider or reject" when deciding factual issues. *Id*. at 535. Thus, when an expert testifies that the defendant was "part of a group of persons that *may or may not*" have satisfied an element of the offense, the "ultimate issue" was still "left to the jury's judgment." *Id*. at 536 (emphasis *Diaz*).

Here, Professor Cooper, like the government's drug expert in *Diaz*, did not claim that *all* foster children in immigration proceedings lack knowledge of their place of birth or personal history—only that "many of them" do. 4-ER-449. Similarly, Professor Cooper stated that "*some* U.S. citizens end up getting erroneously deported" and "around ten percent" of people in deportation proceedings have potential claims to U.S. citizenship. 4-ER-449–50 (emphasis added). So Professor Cooper's

testimony was even *less* likely to run afoul of Rule 704(b) than the admissible testimony in *Diaz* that "most" couriers know there are drugs in the car. 602 U.S. at 535. Accordingly, Professor Cooper's expert testimony was admissible under both Rules 702 and 704(b).

### D. The district court did not correctly apply the Federal Rules of Evidence, *Diaz*, or this Court's precedent.

To determine whether a trial court abused its discretion, this Court must first "determine de novo whether the trial court identified the correct legal rule to apply to the relief requested." *Hinkson*, 585 F.3d at 1262. A district court automatically abuses its discretion when it "bases its decision on an erroneous view of the law." *United States v. Campos*, 217 F.3d 707, 710 (9th Cir. 2000).

Here, the district court excluded Professor Cooper's testimony without ever mentioning Rules 702 or 704(b). 1-ER-6–9. Nor did it reference their requirements or any key words or phrases from these Rules. 1-ER-6–9. Nor did the court apply any case law relating to these Rules, apart from seeing a "distinction" between Mr. Claros' case and *Diaz*. 1-ER-8, 9. Thus, the court automatically abused its discretion by failing to identify "the correct legal rule." *Hinkson*, 585 F.3d at 1262.

But even if the trial court somehow *sub silentio* applied Rules 702 and 704(b), it still abused its discretion. First, the court only considered whether Professor Cooper's testimony was relevant to Mr. Claros' statements as a minor. 1-ER-6–9. The court never considered the other

35

purpose for Professor Cooper's testimony—to show that U.S. citizens are sometimes erroneously deported to Mexico. 1-ER-6–9. Yet the court permitted the government's witness (who was not even an expert) to testify to the opposite by saying that he had seen Mexico turn away deportees who are not Mexican citizens. 2-ER-71–72. In other words, the court never considered whether Professor Cooper's testimony was admissible to prove a different factual issue—one that the court then allowed a government *non-expert* witness to testify about.

Moreover, the analysis the court *did* provide did not comport with Rules 702 and 704(b). The court held that Professor Cooper's testimony was "not relevant to the elements of the charged offense" because:

> Any information this witness can provide regarding the *generalities* that can happen to minors who are deported does not provide any specific information that *makes an element of the crime charged any more or less true*. There is no evidence that she is *familiar with the process that Mr. Claros specifically experienced*. There is no information that Mr. Claros was *one of the small percentage of individuals that she worked with* in the past.

1-ER-3–4 (emphases added).

To begin, Professor Cooper's testimony was squarely "relevant to the element" of alienage. To prove alienage, the government relied on Mr. Claros' "admissions" and deportations—all of which traced back to Mr. Claros' statement as a 13-year-old that he was born in Mexico. 4-ER-505. But Professor Cooper would have cast doubt on that original

36

statement by testifying that many children in the foster system, "do not know where they were born," "do not know their biological parents," and "do not have reliable information about their own origins." 4-ER-449. If the jury believed that Mr. Claros—like the foster children Professor Cooper described—did *not* know where he was born, it would have severely undermined the original source for the government's primary evidence of alienage.

The court also claimed that Professor Cooper was not "familiar with the process that Mr. Claros specifically experienced" because she had not "worked with" him personally. 1-ER-4. But this is no different than the drug expert in *Diaz* who had never met the defendant and was "not involved in Diaz's case." *Diaz*, 602 U.S. 535. Similarly in *Vallejo*, this Court expressly rejected an expert witness's "failure to personally examine" a defendant as a basis for exclusion. 237 F.3d at 1021. *Vallejo* explained that "the Supreme Court has explicitly held" that experts may offer opinions "'that are not based on firsthand knowledge or observation.'" *Id.* (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993)). In fact, this Court has frequently admitted expert testimony "even when the expert 'did not testify about the facts of this case, or about the particular victim, whom she had never examined.'" *Id.* (quoting *Bighead*, 128 F.3d at 1330). So the fact that Professor Cooper had not "worked with" Mr. Claros personally could not be the basis to exclude her testimony.

37

The "distinctions" the district court drew with *Diaz* also flopped. 1-ER-8, 9. The court stated that because the government was "not seeking to introduce any evidence regarding the fact that [Mr. Claros] was removed as a minor," Professor Cooper "wouldn't be able to say, 'In my experience working with minors, this is what happened.'" 1-ER-8–9. But regardless of whether *the government* introduced evidence that he was "removed as a minor," *Mr. Claros* could do so, which is exactly what he did when testifying on his own behalf. 3-ER-273–86.

To the extent the district court made other "distinctions" with the drug expert in *Diaz*, those distinctions were immaterial. 1-ER-8, 9. For instance, the court claimed that Professor Cooper's testimony "wouldn't really be the same" as a government drug expert because a drug expert would say, "'[t]he drugs were hidden in this manner. The Defendant's mannerisms, the responses to questions are consistent with a person who, you know, is a courier. And couriers are sometimes knowing and sometimes unknowing.'" 1-ER-9.

But as Justice Jackson's concurrence explained, *Diaz*'s holding is not limited to government drug experts. *Diaz*, 602 U.S. at 540–41. To the contrary, defendants may present expert witnesses to provide "critical assistance to lay factfinders" in cases involving domestic abuse or a defendant's mental health or. *Id*. at 540–41; *see also id*. at 551 ("[W]hat is good for the goose is good for the gander.") (Gorsuch, J., dissenting). Here, to paraphrase the district court's statement,

38

Professor Cooper could have testified that "[Mr. Claros'] mannerisms, the responses to questions are consistent with a person who, you know, is a [foster child]. And [foster children] are sometimes knowing and sometimes unknowing" when it comes to their personal history and place of birth. 1-ER-9. Thus, no material "distinctions" existed between the testimony of Professor Cooper and the drug expert in *Diaz*.

The district court also believed that expert testimony was not needed because Mr. Claros could "testify and explain any confusion that he may have about his alienage based on his – any lack of family presence." 1-ER-4; *see also* 1-ER-9 (denying expert testimony but "allow[ing]" Mr. Claros to testify as to "his own personal path to where he's at today"). But even where a defendant "could and did testify" on his own behalf, this Court has held that an expert could "provide a counterweight" to the government's allegations. *Finley*, 301 F.3d at 1013. This is because "[o]ur case law recognizes the importance of expert testimony when an issue appears to be within the parameters of a layperson's common sense, but in actuality, is beyond their knowledge." *Id*; *see also Morales*, 108 F.3d at 1034 (rejecting the court's exclusion on the basis that "obviously [the defendant] can testify to it herself"). Thus, allowing Mr. Claros to testify about "any confusion" in his personal history was not an adequate substitute for Professor Cooper's professional opinion. 1-ER-4.

39

At a minimum, the "best way" for the district court to deal with concerns about Professor Cooper's testimony was "not to bar [her] from testifying altogether," but rather to impose limits on her testimony. *United States v. Cohen*, 510 F.3d 1114, 1126 (9th Cir. 2007). For instance, courts may "sustain the government's objections to particular questions likely to elicit inadmissible evidence" or set "limits . . . on the scope of [the expert's] testimony." *Id.* And as Justice Jackson's concurrence noted, "parties can utilize the traditional tools in a lawyer's toolkit, like vigorous cross-examination and careful refutation in closing argument." *Diaz*, 602 U.S. at 541. Such remedial measures are preferable to "the drastic remedy of excluding a witness altogether." *Finley*, 301 F.3d at 1018.

Because the district court did not properly apply Rules 702 and 704(b), it abused its discretion by excluding Professor Cooper's expert testimony.

### E.   The government cannot show this error was harmless.

"When expert testimony has been erroneously excluded, [this Court] applies the harmless error standard for nonconstitutional error." *Morales*, 108 F.3d at 1040. Under this standard, the Court "must reverse unless there is a fair assurance of harmlessness or, stated otherwise, unless it is more probable than not that the error did not materially affect the verdict." *Id.* (quotations omitted). The government

40

bears this burden to show "a fair assurance of harmlessness." *United States v. Seschillie*, 310 F.3d 1208, 1214–15 (9th Cir. 2002).

Here, the government did not have a Mexican birth certificate or any other document showing that Mr. Claros was a citizen of Mexico. All it had was a history of deportations and "admissions" that traced back to the single statement Mr. Claros made as a 13-year-old foster child in immigration custody. 4-ER-505.

So when Mr. Claros' testimony called the accuracy of that statement into question, the government attacked Mr. Claros' credibility in an aggressive cross-examination—going through decades of his past statements and asking no fewer than forty times whether "[t]hat was a lie." 3-ER-299–337. The government also used one of Mr. Claros' prior felony convictions to impeach him. 3-ER-329–30. And the government made Mr. Claros' credibility the centerpiece of its opening and closing statements. 2-ER-39–43, 3-ER-356–65, 383–87. The prosecutor repeatedly referred to Mr. Claros' defense as "speculation," 3-ER-363, 364, 384, 385, returning again and again to the theme that Mr. Claros has "been lying for the past 40 years. He's lied about his name. He's lied about his parents' names. He's lied about his date of births [sic], and now he wants to pick and choose.'" 3-ER-384.

Professor Cooper's testimony would have provided a critical "counterweight" to this attack on Mr. Claros' credibility. *Finley*, 301 F.3d at 1013. She would have testified that "many children in the

41

immigration system—especially those in the foster system—do not have reliable information about their own origins" and "do not know their biological parents, do not know their precise date of birth, and do not know where they were born." 4-ER-449. As in *Vallejo*, this would have helped jurors understand "why [Mr. Claros] would make false statements even though they were inconsistent with his apparent self-interest." 237 F.3d at 1020. Thus, Professor Cooper "could have rehabilitated [Mr. Claros'] credibility" and "placed in context through expert testimony" his "outwardly inconsistent" behavior. *United States v. Lopez*, 913 F.3d 807, 825 (9th Cir. 2019).

Professor Cooper's testimony also would have provided a "counterweight" to the government's claim that Mexico does not accept U.S. citizen deportees. *Finley*, 301 F.3d at 1013. Over objection, the prosecutor questioned the A-file custodian about whether, in the process of deporting people, the Mexican government would "ever send them back to you?" 2-ER-71. The custodian confirmed that this had happened to him once, stating that Mexican officials "did their due diligence to find out if they were a Mexican citizen, and they came back with 'no,' that they weren't." 2-ER-72.

During closing arguments, the prosecutor then elevated this single incident into a broad factual claim, asserting that "if the United States showed up and tried to send over a United States citizen, that person would be sent back." 3-ER-362. After the district court overruled

42

Mr. Claros' objection, the prosecutor reiterated: "Let me say that again: When someone is presented at the border, when they are sent over to Mexico, if they're a United States citizen, Mexico sends them back." 3-ER-362. On rebuttal, the prosecutor used this evidence to argue that Mr. Claros was not a U.S. citizen, since every time he was deported, "Mexico accepted [him]. Mexico didn't turn him back. They accepted him." 3-ER-385.

By contrast, Professor Cooper would have testified that "some U.S. citizens end up getting erroneously deported" and that she herself had "represented U.S. citizens who have been wrongfully deported." 4-ER-449–50. In fact, she estimated that "around ten percent of the individuals I interview have claims to U.S. citizenship that I need to investigate." 4-ER-450. Such testimony would have been a powerful counterweight to the custodian's *non-expert* testimony about a single incident that the prosecutor then turned into a blanket statement of fact.

By excluding Professor Cooper's testimony, the district court "deprived [Mr. Claros] of the only corroborating evidence [he] had." *Morales*, 108 F.3d at 1040. And this corroborating evidence went to the heart of the only contested element at trial—alienage—where the government's only evidence was Mr. Claros' own statements and the resulting deportations. So as in *Morales, Finley, Cohen, Lopez*, and *Vallejo*, the government cannot meet its burden to show that the

43

exclusion of Professor Cooper's testimony "did not materially affect the verdict." *Morales*, 108 F.3d at 1040. Thus, this Court should remand for a new trial.

## II. The government's failure to disclose its search for the birth certificate and provide further details violated *Brady*.

### A. Standard of review

This Court reviews de novo all questions of law in the *Brady* context. *United States v. Cloud*, 102 F.4th 968, 976 (9th Cir. 2024). Clear error review applies to the district court's factual findings. *Id.* at 975. But "once the existence and content of undisclosed evidence has been established," de novo review applies to questions of whether the evidence was favorable, suppressed, and material. *Id.* (quotations omitted).

### B. A *Brady* violation occurs when evidence is favorable, suppressed, and material.

In *Brady v. Maryland*, the Supreme Court held that prosecutors must disclose to the defense "evidence favorable to an accused" that is "material either to guilt or to punishment." 373 U.S. at 87. This is because the government's interest "is not that it shall win a case, but that justice shall be done." *United States v. Bundy*, 968 F.3d 1019, 1023 (9th Cir. 2020). Thus, "failing to disclose material, favorable evidence violates due process because it compromises the integrity of the

44

defendant's trial." *United States v. Bruce*, 984 F.3d 884, 894 (9th Cir. 2021).

In the *Brady* context, the government's motives are irrelevant—even when a prosecutor did not act "willfully, maliciously, or in anything but good faith," an "'innocent' failure to disclose favorable evidence" is still a *Brady* violation. *United States v. Price*, 566 F.3d 900, 908 (9th Cir. 2009). Moreover, "[t]he prosecution's duty to disclose favorable evidence is not dependent upon a request from the accused." *Bruce*, 984 F.3d at 894. Rather, a defendant asserting a *Brady* violation need only show three things: (1) the evidence was "favorable to him, either because it was exculpatory or impeaching"; (2) the prosecution "suppressed" the evidence, whether "willfully or inadvertently"; and (3) the evidence was "material," or "prejudic[ial]." *Id.* at 894–95.

## C. The government's failed search for Mr. Claros' birth certificate was favorable, suppressed, and material.

At 8:30 p.m. on the night before trial, the prosecutor told Mr. Claros that the government had searched for his birth certificate in Mexico but could not find it. 1-ER-11, 2-ER-30, 3-ER-182. The government started this search approximately four weeks before trial. 2-ER-143. Defense counsel immediately asked for information regarding who did the search, when they did it, and when they received the results, but the government did not provide this information. 2-ER-31. Thus, this Court must determine whether the government's search and

45

the details surrounding it were 1) favorable, 2) suppressed, and 3) material.

### 1. The evidence was favorable.

The bar for whether evidence is favorable to the defendant is a "low" one. *Gantt v. Roe*, 389 F.3d 908, 912 (9th Cir. 2004). Here, this "low" bar is easily met because the government's unsuccessful birth certificate search was "indisputably favorable" to Mr. Claros. *Price*, 566 F.3d at 907.

At trial, Mr. Claros' entire theory of defense was that "the Government has not proven beyond a reasonable doubt that he is an alien rather than a citizen of the United States." 3-ER-186. The fact that the United States government—even with all its official channels, contacts, and resources—could not locate a Mexican birth certificate for Mr. Claros lent critical weight to this theory and corroborated Mr. Claros' own testimony that he had tried and failed to obtain proof of Mexican citizenship. 3-ER-292–93. The failed birth certificate search also meant that the government could provide no independent documentation of alienage—leaving it with only Mr. Claros' statements and the self-perpetuating cycle of deportations that flowed from them.

Furthermore, the who-what-and-when details of this search that were never disclosed were also favorable to Mr. Claros. Such details would have allowed Mr. Claros to investigate, interview, and call as witnesses both the U.S. liaison and the Mexican government officials

who conducted the actual search for the birth certificate. Presenting these witnesses would have allowed Mr. Claros to probe the reliability and thoroughness of this search to remove any remaining doubt that a Mexican birth certificate may have existed. Moreover, this would have allowed an independent source unconnected to either party to tell the jury that no birth certificate existed. As defense counsel explained, Mr. Claros "need[ed] these actual witnesses on the stand in front of the jury" to give the evidence its "full exculpatory force." 1-ER-18.

This evidence was also favorable because the A-file custodian could not provide basic information about the search. For instance, he could not confirm the name of the U.S. liaison who reached out to the Mexican government—or even whether this liaison had done so at all. 2-ER-143. The custodian did not know the name of the Mexican consular official and was "not exactly sure" what names or birthdates were used for the search. 2-ER-144–45. The prosecutor then used this uncertainty to cast doubt on the reliability of the search, eliciting the custodian's statement that he did not know whether "the people [he] provided information to actually provided that information to the Mexican people" and "what was actually searched." 2-ER-96.

Finally, the failed search and its details could have provided impeachment material for the A-file custodian by undermining the government's timeline of events. The custodian testified that he initiated the search at the prosecutor's request approximately "four

weeks" before trial. 2-ER-143. According to the prosecutor, the U.S. liaison then inquired about "multiple names" and "multiple dates of birth" but didn't receive any information until the day before trial. 1-ER-15. If the liaison or Mexican officials had given a different timeline for these events, it would have undercut not only the custodian's credibility but also the government's excuse for failing to turn over evidence until the night before trial. Thus, the government's unsuccessful search for the birth certificate and the details surrounding it were favorable to Mr. Claros.

### 2. The evidence was suppressed.

Not only was the birth certificate search and its accompanying details favorable to Mr. Claros, the government suppressed them.

"Disclosure, to escape a *Brady* sanction, must be made at a time when the disclosure would be of value to the accused." *Cloud*, 102 F.4th at 976 (quotations and alterations omitted). Here, the government did not disclose that it had unsuccessfully searched for Mr. Claros' birth certificate until 8:30 p.m. on the night before trial. 1-ER-11, 2-ER-30, 182. As defense counsel explained, this eleventh-hour disclosure stripped the "probative *Brady* evidence" of much of its "value to the accused." 1-ER-12; *Cloud*, 102 F.4th at 976. Although defense counsel cross-examined the A-file custodian about the search, Mr. Claros did not have "the ability to actually introduce this particular evidence" in his

48

own case-in-chief because "[w]e don't know who[ ] these second- and third-hand hearsay witnesses are." 1-ER-12.

What's more, the government never provided the other information defense counsel requested when he became aware of the search—i.e., the names of the "federal agent acting as the Mexican liaison" and the liaison's "contact in the Mexican government," as well as "when the federal agent contact[ed] the Mexican government" and when the government "receive[d] this information." 1-ER-12. So even assuming the eleventh-hour disclosure of the search itself had some "value to the accused," *Cloud*, 102 F.4th at 976, the prosecutor nevertheless suppressed other *details* of that search.

The government cannot argue that this information was not "suppressed" because it was not in its possession. Evidence within a prosecutor's "possession" is "not limited to what the prosecutor personally knows." *United States v. Cano*, 934 F.3d 1002, 1023 (9th Cir. 2019). Rather, the "individual prosecutor has a duty to learn of any favorable evidence known to those acting on the government's behalf." *Id.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)) (alterations omitted). This is because prosecutors are in a "unique position to obtain information known to other agents of the government" and thus "have an obligation to disclose what they do not know but could have learned." *Id.* (quotations and alterations omitted). So the prosecutor "will be deemed to have knowledge of and access to anything in the possession,

49

custody or control of any federal agency participating *in the same investigation of the defendant.*" *Id.* at 1025 (emphasis in Cano); *see also Cloud*, 102 F.4th at 976 (same).

Here, the prosecutor, the A-file custodian, and the U.S. liaison who "contact[ed] the Mexican government" were all "participating *in the same investigation of* [Mr. Claros]." 1-ER-12; *Cano*, 934 F.3d at 1025. So at a minimum, information about the search was in the prosecutor's possession (and thus suppressed) as soon as the Mexican government told the U.S. liaison that there was no birth certificate for Mr. Claros. And the prosecutor's own explanation shows this may have been weeks before trial. According to the prosecutor, the liaison's initial search "only provided one name for Mr. Claros" and did not locate a birth certificate under that name. 1-ER-15. As a result, "the United States asked if they could inquire with multiple dates of births and multiple names," and purportedly did not hear back until the day before trial 1-ER-15. But evidence of the absence of a birth certificate was in the prosecutor's "possession" as soon as the first search turned up empty. *See Price*, 566 F.3d at 907 ("[S]ins of omission are equally within Brady's scope."). Thus, both the results of the first search, as well as the details surrounding all searches, were "suppressed."

### 3. The evidence was material.

Finally, the prosecutor's failure to disclose the search and provide further details was material. "In evaluating materiality, our *Brady* case

law has used 'prejudice' and 'materiality' interchangeably." *Cloud*, 102 F.4th at 979. Evidence is prejudicial or material if there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Kohring*, 637 F.3d 895, 902 (9th Cir. 2011) (quotations omitted).

But a "reasonable probability" may be found "even where the remaining evidence would have been sufficient to convict the defendant." *Id.* (quotations omitted); *see also Cloud*, 102 F.4th at 980 (stating that "[w]hether a jury would ultimately find the evidence convincing and lead to an acquittal is not the measuring rod here") (quotations omitted). Thus, a "reasonable probability exists when suppression of evidence merely ""undermines confidence in the outcome of the trial.'" *Kohring*, 637 F.3d at 902 (quoting *Kyles*, 514 U.S. at 434).

In determining materiality, this Court has also considered "whether, had the evidence been timely disclosed, it might have altered the prosecution or defense strategy." *Cloud*, 102 F.4th at 980. The Court may also consider whether suppressed evidence "hindered [the defendant's] ability to prepare his case fully and make stronger opening statements." *Id.* (quotations and alterations omitted). And a prosecutor's "belated disclosure" may prejudice a defendant if it forced them to "scramble to figure out an appropriate course of action." *Id.* at 981 (quotations omitted).

51

Here, the prosecutor's failure to disclose the birth certificate search and provide further details met the materiality threshold. As defense counsel explained, it denied him "the opportunity to actually use it in Mr. Claros's defense" by interviewing the people who conducted the search—the U.S. liaison and Mexican officials—and then presenting their testimony at trial. 1-ER-12. Instead, he was left with the testimony of the A-file custodian, who could not "speak with any sort of firsthand knowledge about what steps were actually taken" during the search. 1-ER-17–18.

In fact, the government exploited the custodian's ignorance to its advantage. When questioning the A-file custodian, the prosecutor suggested that the search was unreliable because the custodian did not know whether "the people [he] provided information to actually provided that information to the Mexican people and what was actually searched." 2-ER-96. On cross-examination, the custodian also refused to say that there was "no record of *Mr. Claros* in Mexico"—only that there was no record of someone with the *names and birthplaces* the custodian had provided—implying that a birth certificate for Mr. Claros might still exist. 2-ER-146, 147 (emphasis added). And during the prosecutor's cross-examination of Mr. Claros, the prosecutor commented that it was "no surprise they couldn't find [his] birth certificate" because they "didn't have accurate information." 3-ER-322. So the prosecutor's failure

52

to disclose details of the search not only hurt Mr. Claros' case, it helped the government.

The district court also shut down Mr. Claros' other attempts to remedy the situation. For instance, the district court denied Mr. Claros' request for an adverse jury instruction stating that due to the government's late disclosure, the jury should assume there was no record of Mr. Claros being born in Mexico. 3-ER-350–52. And the government refused to enter into a stipulation that would have explained the late disclosure to the jury. 3-ER-180–85. Thus, the only evidence the jury heard was the A-file custodian's vague testimony that someone else did a search but that he didn't know "what was actually searched." 2-ER-96.

As a result, the government was able to infer to the jury that a Mexican birth certificate *existed* for Mr. Claros—the government just hadn't found it. But if the government had properly disclosed the search and its details, Mr. Claros could have rebutted this claim by calling witnesses to provide concrete information on the nature of the search, who did it, and how reliable it was. For instance, a Mexican government official could have testified about the civil registry system, its computer systems, how searches are conducted, and the likelihood that a Mexican citizen would not have a birth certificate in the system. So not only did the prosecutor's eleventh-hour disclosure of the search force Mr. Claros to "scramble to figure out an appropriate course of action," the

53

prosecutor's failure to provide further details "hindered [Mr. Claros'] ability to prepare his case fully." *Cloud*, 102 F.4th at 980, 981.

Finally, when considering prejudice, it bears repeating that the government presented no independent evidence that Mr. Claros was a citizen of Mexico. Its evidence consisted entirely of Mr. Claros' own admissions and deportations—all of which traced back to a single statement by a 13-year-old foster child that even an INS officer doubted was true. Thus, the suppression of this evidence "undermine[d] confidence in the outcome of the trial" and was material. *Kohring*, 637 F.3d at 902.

*    *    *

Because the government's unsuccessful search for a birth certificate and the details surrounding it were favorable, suppressed, and material, its disclosure failures violated due process and *Brady*. Thus, this Court must remand for a new trial.

## CONCLUSION

Because the district court committed two errors that went directly to the only contested element at trial, this Court should vacate Mr. Claros' conviction and remand for a new trial.

Respectfully submitted,


DATED:    March 26, 2025
                */s/ Kara Hartzler*          
KARA HARTZLER
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone: (619) 234.8467

Attorneys for Defendant-Appellant

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 24-7288

I am the attorney or self-represented party.

**This brief contains** | 12,454 | **words,** including | | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☐ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated | | .

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | *s/ Kara Hartzler* | **Date** | 3/26/25

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** | *Rev. 12/01/22*